Pennsylvania Labor Relations Board *v.* State College Area School District.

230

Argued March 7, 1973, before President Judge Bow-
MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MENCER, ROGERS and BLATT.

*Clarence C. Morrison,* for appellant, State College Education Association.

*James L. Crawford,* with him *James F. Wildeman* and *Francis A. Zulli,* Assistant Attorneys General, for appellant, Pennsylvania Labor Relations Board.

*John R. Miller,* with him *Miller, Kistler & Campbell, Inc.,* for appellee, State College Area School District.

*William Fearen,* with him *Cleckner & Fearen,* for Pennsylvania School Board Association.

*Woodley B. Osborne,* with him, of counsel, *Stephen R. Goldstein* and *Robert A. Gorman,* for American Association of University Professors.

*Richard Kirschner,* with him *Markowitz and Kirschner,* for American Federation of State, County and Municipal Employees, AFL-CIO.

*Leonard M. Sagot,* with him *Thomas W. Jennings,* and, of counsel, *Ettinger, Poserina, Silverman, Dubin, Anapol and Sagot,* for Pennsylvania Federation of Teachers.

*Jerome H. Gerber,* with him *Handler, Gerber, Widmer and Weinstock,* for Pennsylvania State AFL-CIO.

OPINION BY JUDGE MENCER, June 6, 1973:

The State College Education Association (Teachers) and the Pennsylvania Labor Relations Board (Labor

Board) filed separate appeals from a final order of the Court of Common Pleas of Centre County, under date of November 7, 1972, affirming in part and reversing in part a final order of the Labor Board.

The teachers, on February 26, 1971, filed a charge of unfair labor practices with the Labor Board and against the State College Area School District (School Board). It was alleged by the Teachers that the School Board had engaged in unfair labor practices contrary to the provisions of Section 1201, subsection (a), clause (5) of Article XII of the Act of July 23, 1970, P. L. 563, 43 P.S. §1101.1201(a)(5)(Act 195). These provisions prohibit public employers, their agents or representatives from refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

The refusal alleged here centers around 21 items about which the Teachers sought to bargain with the School Board. The School Board admits its refusal to bargain on these items[1] and asserts that they were items of inherent managerial policy and, therefore, were not subject to collective bargaining because of the provisions of Section 702 of Act 195, 43 P.S. §1101.702. Following hearings before a hearing examiner, during which all parties were afforded the opportunity to present testimony, introduce evidence and cross-examine witnesses, the Labor Board issued a nisi decision and order on October 14, 1971, dismissing the charge of unfair labor practice against the School Board. Exceptions were filed to this order by the Teachers and after oral argument and the presentation of briefs, the Labor

---

[1] The School Board had offered to "meet and discuss" with the Teachers in respect to the 21 items, in accord with the provisions of Section 702 of the Act, 43 P.S. §1101.702.

Board, on June 26, 1972, issued its final order in which it ruled that the School Board had failed to bargain in good faith with the Teachers on five of the 21 items. The Labor Board affirmed its ruling as to the other 16 items and held that these were not bargainable and, therefore, the School Board had not violated the provisions of Act 195 as to those 16 items.

Both the School Board and the Teachers petitioned the Court of Common Pleas of Centre County for review of the final order of the Labor Board in accord with the provisions of Section. 1502, as amended, of Act 195, 43 P.S. §1101.1502. The Court of Common Pleas of Centre County affirmed the final order of the Labor Board as to the 16 items which were held to be nonbargainable and reversed the final order of the Labor Board as to the five items which the Labor Board had ruled to be proper subjects for mandatory collective bargaining. These appeals followed.

In *Pennsylvania Labor Relations Board v. Kaufmann Department Stores, Inc.,* 345 Pa. 398, 29 A. 2d 90 (1942), the Supreme Court held that the scope of appellate review is limited to a determination of whether the findings of the Labor Board are supported by substantial and legally credible evidence and whether the conclusions deduced therefrom are reasonable and not capricious, arbitrary or illegal. *Kaufmann* was interpreting in this regard identical language as we have here. Section 1501 of Act 195, 43 P.S. §1101.1501, provides, *inter alia,* that "[t]he findings of the board as to the facts, if supported by substantial and legally credible evidence shall be conclusive."

The difficult question posed by these appeals can be stated thus: Do any of the 21 items about which the Teachers sought to bargain come within the scope of collective bargaining required under Act 195, known as the Public Employe Relations Act? The answer to this question must encompass a careful consideration of the

meshing and intertwining provisions of Sections 701, 702 and 703 of Act 195, 43 P.S. §§1101.701, 1101.702 and 1101.703. These three sections read as follows:

"Section 701 [§1101.701 Matters subject to bargaining]. Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.

"Section 702 [§1101.702 Matters not subject to bargaining]. Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

"Section 703 [§1101.703 Implementation of provisions in violation of, or inconsistent with statutes or home rule charters]. The parties to the collective bargaining process shall not effect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters."

Perhaps our point of departure should be to recall the legal posture of public labor relations prior to Act 195. The Act of June 30, 1947, P. L. 1183, 43 P.S. §215.1 et seq., known as The Public Employe Act of 1947, and which Act 195 specifically repealed as to public employes,[2] prohibited all strikes by public employes and did not require public employers to bargain collectively with their employes. Although strikes by public employes were particularly forbidden, numerous illegal strikes did occur and labor unrest in the public sector became widespread. This situation led to the creation of a Commission for the Revision of Pennsylvania Public Employe Laws which became known as the Hickman Commission.

Subsequent to the issuance of the report of the Hickman Commission various pertinent bills were introduced in the General Assembly of Pennsylvania. The final result was the enactment into law of Act 195. Article I, Section 101[3] of Act 195 is captioned "Public Policy" and reads as follows: "The General Assembly of the Commonwealth of Pennsylvania declares that it is the public policy of this Commonwealth and the purpose of this act to promote orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare. Unresolved disputes between the public employer and its employes are injurious to the public and the General Assembly is therefore aware that adequate means must be established for minimizing them and providing for their resolution. Within the limitations imposed upon the governmental processes by these rights of the public at large and recognizing that harmonious relationships

[2] 43 P.S. §1101.2201.
[3] 43 P.S. §1101.101.

are required between the public employer and its employes, the General Assembly has determined that the overall policy may best be accomplished by (1) granting to public employes the right to organize and choose freely their representatives; (2) requiring public employers to negotiate and bargain with employe organizations representing public employes and to enter into written agreements evidencing the result of such bargaining; and (3) establishing procedures to provide for the protection of the rights of the public employe, the public employer and the public at large."

This declaration underscores two important factors. Act 195 is dealing in the public sector of labor relations and, secondly, it is intended to afford public employes a limited right of collective bargaining with public employers, subject, however, to the paramount rights of the public at large.

Since Act 195 deals with the public sector of labor relations and has as an integral part of its plan the limiting provisions to collective bargaining of Sections 702 and 703, it is unique and lends itself more to interpretation than to camparisons. Consequently, the myriad of National Labor Relations Board cases and Federal decisions dealing with statutes that do not contain such limitations to collective bargaining and generally dealing in the private sector of labor relations are of little precedent or real assistance, at least in the interpretation of Section 701.

Although in this case we have public employes who also come within the definition of professional employes as set forth at Section 301(7) of Act 195, 43 P.S. §1101.301(7), it would appear that this fact has no relevance to interpreting Sections 701, 702 and 703. The definition of "professional employes would seem to be solely for the purpose of separating them from nonprofessional employes in making the determination

of the appropriate public employer unit in accord with the provisions of Section 604 of Act 195, 43 P.S. §1101.-604. The definition of "public employe" as set forth at Section 301(2) of Act 195, 43 P.S. §1101.301(2), covers and does not exclude professional employes. Therefore, in considering Section 701, we are confined to public employes, and this section has the same application to school teachers as it does to all other public employes.

These preliminary observations then provide us with general concepts which serve as a basis upon which to launch our analysis of Sections 701, 702 and 703 and to thereafter make application to the specific 21 items here in question.

### Applicable General Concepts

1. Prior to Act 195, public employes in Pennsylvania had no legal right to strike and public employers were not required to bargain collectively with their employes.

2. Act 195 was enacted to govern labor relations between public employes and public employers and cannot be solely interpreted by reference to rulings, decisions, or case law interpreting statutes enacted to govern the private sector of labor relations.

3. Act 195 affords to public employes a limited and qualified right to strike and to bargain collectively.

4. Act 195 places an overriding limitation on collective bargaining by public employes as to matters of inherent managerial policy and those that would be inconsistent with or in conflict with any statute of the Commonwealth of Pennsylvania or provision of a municipal home rule charter.

5. Professional employes, including school teachers, arrive at the bargaining table under Section 701 in the same posture as any other public employes.

6. Act 195 must be construed as intending to favor the public interest.

### ANALYSIS OF SECTIONS 701, 702 AND 703

A careful reading of these sections discloses that the Legislature designated whether items were (a) bargainable items or (b) not bargainable items but subject to a "meet and discuss" requirement.

Section 701 expressly requires the public employer to participate in good faith in collective bargaining with respect to wages, hours and other terms and conditions of employment. However, we are unable to stop here as it is just not a question of whether the item involves wages, hours and other terms and conditions of employment. Assuming that a proposed item for collective bargaining does involve such matters, the further and controlling question must be asked and answered as to whether the item *also* involves matters of inherent managerial policy and, if the answer to this question is in the affirmative, the item is not bargainable under the provisions of Section 702.

Section 702 provides that public employers shall not be required to bargain as to any matter of inherent managerial policy[4] *but,* if the policy matter affects wages, hours and terms and conditions of employment as well as the impact thereon, upon request, the public employers must meet and discuss such policy matter. However, *the controlling provision,* not to be overlooked, is that under Section 702 a public employer is not required to bargain on any policy matter *notwithstanding the effect or impact that it may have on wages, hours, and terms and conditions of employment.*

Likewise, the duties and prerogatives imposed upon and granted to school boards under the Public School Code of 1949 cannot be the subject of collective bargaining because of the restriction and prohibition contained *in Section 703.*

---

[4] Public employers are of course free to so bargain but are not required to do so by Act 195.

The definition of "public employer" as set forth at Section 301(1) of Act 195, 43 P.S. §1101.301(1), includes school districts and the boards thereof. Since Section 702 provides that public employers shall not be required to bargain over matters of inherent managerial policy, we ought to consider what responsibilities for the operation of the public schools have been placed on school boards by the Legislature. In *Slippery Rock Area Joint School System v. Franklin Township School District*, 389 Pa. 435, 442, 133 A. 2d 848, 852 (1957), it was stated that " '. . . a school district is an agency of the State, created by law for the purpose of promoting education, deriving all of its powers from the statute, and discharging only such duties as are imposed upon it by statute. The school district is an agency of the State charged with the sovereign duty of building and maintaining the schools within its particular territory and with the further duty of securing, managing, and spending the necessary funds in the interest of public education. . . .' " Article 10, Section 1 of the Pennsylvania Constitution of 1874 directed the Legislature to maintain a "thorough and efficient system of public schools." Article 3, Section 14 of our present Pennsylvania Constitution provides that "[t]he General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." The school districts are agencies of the Legislature to administer this constitutional duty. *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90 (1937). The Public School Code of 1949, Act of March 10, 1949, P. L. 30, as amended, 24 P.S. §1-101 et seq., contains Section 211, 24 P.S. §2-211, which provides that "[t]he several school districts in this Commonwealth shall be, and hereby are vested as, bodies corporate, with all necessary powers to enable them to carry out the provisions of this act [Public School Code of 1949]." Thus we must con-

clude that school boards have traditionally been given by the Legislature, under constitutional mandates, broad inherent managerial powers to operate the public schools and to determine policy relative thereto. If Act 195 represents a departure from the traditional principle of our public schools' being operated and managed by school boards, it would be a sharp departure not to be presumed but the result of clear legislative declaration. A statute is never presumed to deprive the state of any prerogative or right unless the intention to do so is clearly manifest, either by express terms or necessary implications. *Hoffman v. Pittsburgh,* 365 Pa. 386, 75 A. 2d 649 (1950).

What then is encompassed by the phrase "matters of inherent managerial policy"? Section 702 itself provides the initial interpretive guides when it states that this phrase "shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel."

We know there are other areas of discretion or policy since the illustrative list provided in Section 702 is specifically stated as not being all inclusive. As to school boards, we note that in *Smith v. Darby School District,* 388 Pa. 301, 130 A. 2d 661 (1957), Mr. Justice (now Chief Justice) JONES wrote the following apropos observations:

"This court has said: 'By the School Code, the school directors are given power to administer the public school system; they are commanded to employ the necessary qualified teachers to conduct school affairs and keep the schools open': Ehret v. Kulpmont Borough School District, supra, p. 523; Walker et al. v. Scranton School District, 338 Pa. 104, 108, 12 A. 2d 46; Houtz Appeal, supra, p. 541. 'It is the administrative function

of the school directors and superintendents to meet changing educational conditions through the creation of new courses, reassignment of teachers, and rearrangement of curriculum.': Jones v. Holes et al., 334 Pa. 538, 542, 6 A. 2d 102; Mazzei v. Scranton School District, 341 Pa. 255, 260, 19 A. 2d 115; Wesenberg Case, supra, p. 444; Welsko v. Foster Township School District, supra, p. 394.

"The right of a school board to make reasonable rules and regulations,[7] reassign teachers and take other steps necessary for a proper administration of the school system has been recognized on many occasions." 388 Pa. at 312-13, 130 A. 2d at 668.

"School authorities must be given broad discretionary powers to ensure a better education for the children of this Commonwealth and any restrictions on the exercise of these powers must be strictly construed on the basis that the public interest predominates and private interests are subordinate thereto. . . ." 388 Pa. at 314, 130 A. 2d at 668-69.

In *Commonwealth v. Sunbury School District*, 335 Pa. 6, 6 A. 2d 279 (1939), Mr. Justice (later Chief Justice) DREW wrote as follows: "The fundamental policy of our public school system is to obtain the best educational facilities for the children of the Commonwealth. To this end must be subordinated all personal and partisan considerations: Walker's Appeal, 332 Pa. 488. The duty of devising methods by which this important obligation can be discharged devolves upon the school boards." 335 Pa. at 11, 6 A. 2d at 281. "All

---

"[7] 'The Board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs and the conduct and deportment of all superintendents, teachers and other appointees or employes during the time they are engaged in their duties to the district. . . .': Public School Code of 1949, supra, §510, 24 P.S. §5-510."

legislation must be construed as intending to favor the public interest; and when it conflicts with private interests, the public interest to be primarily served is the dominating one, not that of the individual: Walker's Appeal, supra." 335 Pa. at 12, 6 A. 2d at 282.

We believe the Labor Board was correct when it stated in its nisi decision the following:

"Broad discretionary powers have been given school authorities to enable them in exercising their policy-making function to ensure a thorough, efficient, effective and better education for the children of this Commonwealth and any erosion of these powers should be strictly constructed on the basis that the public interest is paramount. It has been long recognized that school officials are trustees of the powers vested in them and cannot divest themselves of the powers which have been conferred upon them for a public purpose. . . .

"Policy matters are thought of as rules of conduct and to the extent they *affect* (influence, impinge, encroach, bear upon, or concern) wages, hours and terms and conditions of employment as well as their *impact* (used metaphorically to mean the result, effect or consequence) thereon become mandatory meet and discuss items by the public employer upon request of the public employe representative."

Matters of "inherent managerial policy" over which public employers are not obligated to bargain are such matters that belong to the public employer as a natural prerogative or essential element of the right (1) to manage the affairs of its business, operation or activity and (2) to make decisions that determine the policy and direction that the business, operation or activity shall pursue.

What then is encompassed by the phrase "wages, hours and other items and conditions of employment" as used in Section 701? First, it is important to note that they are words of limitation and do not require

collective bargaining upon other subjects. The enumeration of wages, hours and other items and conditions of employment defines a limited category of issues on which the public employer is required to bargain. The word "wages" would seem the least troublesome to understand and obviously represents the remuneration one will receive for his services or labor. This is *not* a managerial policy matter but rather is inherent in the establishment and continuation of the threshold relationship of employer and employe. How many hours one is going to work; what periods of time will be covered; the starting time; the ending time; and the rest or time out from work periods are all included in the commonly understood word "hours." These items are the subject of collective bargaining under Section 701, but the question of whether a teacher shall be present at a parent-teacher meeting held in the evening would be an example of school board policy affecting hours and would be subject to the meet and discuss requirements of Section 702.

The words "other items and conditions of employment" are no doubt susceptible to varying interpretations. At one extreme they could be considered to apply to any subject which is insisted upon as a prerequisite for continued employment. At the other extreme they could be so narrowly interpreted as to have little or no consequence. We believe they refer to such things as the various physical conditions of one's working surroundings; what quantity and quality of work is required during one's work period; what safety practices prevail at and near the job site; what sick and hospital benefits are available and what vacation benefits are available; what retirement benefits will be provided and how eligibility will be determined. More examples could undoubtedly be mentioned but always we must recall the provisions of Section 702 that none of these

things are subject to collective bargaining on a required basis if they are affected by policy matters.

Our analysis of Sections 701, 702 and 703 of Act 195 produces these applicable criteria:

1. The required bargainable items of Section 701 are of a limited nature.

2. Any item involving matters of inherent managerial policy is a nonbargainable item by virtue of Section 702.

3. Any item of wages, hours, and other items and conditions of employment, if affected by a policy determination, is not a bargainable item.

4. Duties and responsibilities imposed upon and granted to public employers by statutes or the provisions of municipal home rule charters are not subject to collective bargaining by virtue of Section 703.

5. The Legislature has vested broad powers in school boards to administer the public school system[5] and to determine policy pertaining thereto.

6. Any statutory departure from the school board's traditional role of operating and managing our public school must be the result of clear legislative declaration.

7. Inherent managerial policy is a broad term and includes the right to manage and to make decisions that determine policy.

### THE 21 ITEMS

We apply these concepts, criteria, and the provisions of Sections 701, 702 and 703 of Act 195 to the 21 specific items about which the Teachers contend the School Board is required to engage in collective bargaining. In doing so, we keep ever before us our limited scope of review.

The 21 items, retaining for clarity the same item numbers used before the Labor Board, are:

---

[5] Few other public employers have such broad power to manage or control as is inherent in school boards as a result of the power traditionally given them by the Legislature.

1.  The availability of proper and adequate classroom instructional printed material;

2.  The provision for time during the school day for team planning of required innovative programs;

3.  The timely notice of teaching assignment for the coming year;

4.  Providing separate desks and lockable drawer space for each teacher in the district;

5.  Providing cafeteria for teachers in the senior high school;

6.  Eliminating the requirement that teachers perform nonteaching duties such as but not limited to hall duty, bus duty, lunch duty, study hall, and parking lot duties;

7.  Eliminating the requirement that teachers teach or supervise two consecutive periods in two different buildings;

8.  Eliminating the requirement that teachers substitute for other teachers during planning periods and teaching in noncertificated subject areas;

9.  Eliminating the requirement that teachers chaperone athletic activities;

10.  Eliminating the requirement that teachers unpack, store, check or otherwise handle supplies;

11.  Providing that there shall be one night each week free for Association meetings;

12.  Providing that a teacher will, without prior notice, have free access to his personnel file;

13.  Permitting a teacher to leave the building any time during the school day unless he has a teaching assignment;

14.  Providing special teachers with preparation time equal to that provided for other staff members;

15.  Provision for maximum class sizes;

16.  Provision that the Association will be consulted in determining the school calendar;

17. Provision that school will officially close at noon of the last day of classes for Thanksgiving, Christmas, Spring and Summer vacation;

18. Provision that at least one-half of the time requested for staff meetings be held during the school day;

. . . .

20. A provision that the present Tuesday afternoon conference with parents be abolished and teachers hold conferences with parents by appointment at a mutually convenient time;

21. Provision that secondary teachers not be required to teach more than 25 periods per week and have at least one planning period per day; and

22. A provision that elementary teachers shall have one period or fifteen minutes per day for planning purposes.

Although there is some overlapping, we conclude that the 21 items are not bargainable for the following reasons:

Items 2, 3, 6, 7, 8, 10, 11, 13, 14, 15, 16, 17, 18, 20, 21, and 22, because they are within the scope of matters of inherent managerial policy specifically in the area of functions and programs of the public employer;

Items 1, 7, 8, 13, 14, 15, 20, and 22, because they are within the scope of matters of inherent managerial policy specifically in the area of standards of services of the public employer;

Items 1, 4, 5, 6, 10, 15, and 21, because they are within the scope of matters of inherent managerial policy specifically in the area of the overall budget of the public employer;

Items 3, 6, 14, 18, 21, and 22, because they are within the scope of matters of inherent managerial policy specifically in the area of organizational structure;

Items 2, 3, 6, 7, 8, 9, 10, 13, 14, 18, 20, 21, and 22, because they are within the scope of matters of in-

herent managerial policy specifically in the area of direction of personnel; and

Items 1, 3, 4, 5, 6, 9, 10, 12, 16, and 17, because they are within the scope of inherent managerial policy in areas other than those enumerated in Section 702.

Perhaps in the future the Legislature may decide to grant public employes the right to collective bargaining in areas which until now have been within the prerogatives of employer management. Such a legislative decision would be a further departure from the tenet that public employes should not have the right to strike or bargain collectively. Act 195 was a limited step in the direction of equating public employes with private employes in the field of labor relations but whether we should go further in this direction is for the Legislature to determine. However, the Legislature did not go beyond the first step when it enacted Act 195.

Order of the Court of Common Pleas of Centre County is affirmed.

———

OPINION BY JUDGE KRAMER, CONCURRING IN PART AND DISSENTING IN PART:

First, I would like to state that I concur in the legal analysis and rationale as stated by my brother, Judge MENCER, in his excellent majority opinion; however, in utilizing his analysis, I must dissent as to the majority's application of the law to two of the 22 items over which the teachers sought collective bargaining or a "meet and discuss" conference.

My reading of the statute (Act 195) leads me to find a legislative intent to provide for good faith collective bargaining whenever the teachers' employment rights are directly affected by "wages, hours and other terms and conditions of employment." I draw a distinction between the school authority's "inherent managerial policy" as it relates to the. mandated constitu-

tional and statutory duty to provide a thorough and efficient system of public education, and those matters, which while touching on policy, directly affect the public employe teacher. In other words, following the reasoning of the majority, I believe it would be relatively easy for me to argue that almost everything touching upon teachers' employment could be argued to be a matter of "inherent managerial policy." If that is the result of the tack taken by the majority in analyzing what is meant by "inherent managerial policy," then I believe the legislative intent of Act 195 will have been thwarted.

In reading over the 22 items set forth in the majority opinion, I must agree that, as they are worded, it is difficult to fit most of the items into any one category. For instance, in item No. 4, "Providing separate desks and lockable drawer space for each teacher in the district; . . .", I agree with the majority that whether or not each teacher shall be provided with a desk appears to come within the intent of "inherent managerial policy." If, however the teachers had intended to raise an item for collective bargaining concerning the security of the teachers' personal property while on school premises, then I would find that such an item must be considered personal to the teachers in their employment rights, and would hold that such an item would be subject to good faith in collective bargaining. However, inasmuch as item No. 4, as submitted, is ambiguous, I must agree with the majority's disposition of that item.

Item No. 9 states, "Eliminating the requirement that teachers chaperone athletic activities; . . . ." Once again the item, as submitted, is lacking in specificity. If the teachers are attempting to collectively bargain on whether or not they shall be paid for chaperoning athletic events, or whether the number of hours they work shall include such activities, then I would find and hold that item No. 9 is one which must be collectively bar-

gained. As stated, however, it is ambiguous, and I must agree with the majority.

Item No. 3 states, "The timely notice of teaching assignment for the coming year; . . . ." It seems to me that this item is direct and personal to the teacher, when compared with the "inherent managerial policy" of the school district. The timely notice of teaching assignments will permit a teacher to so arrange his or her personal life, and preparation for work as to become an item personal to the teacher and outside the "inherent managerial policy" of the school district. I would hold item No. 3 to be subject to collective bargaining.

Item No. 22 reads, "A provision that elementary teachers shall have one period or fifteen minutes per day for planning purposes." This item also appears to me to be direct and personal to the teacher and comes within the purview of a "condition of employment," and therefore, subject to collective bargaining.

What I am trying to say in this short dissent is that while I agree with the majority's analysis of Act 195, I am concerned that the majority's opinion will be interpreted to mean that teachers have no right to collectively bargain items which may be directly related to their employment. I believe that general interpretations of a complex statute, such as Act 195, could lead to a dissipation of the employment rights intended by the Legislature. It seems to me that the Board and the courts will have to evaluate each item as it is presented and strike a balance. If the item directly affects the "inherent managerial policy" of the school district as it applies to its mandate to provide an education system, then it is not subject to collective bargaining. If the item directly affects a teacher's personal rights, as it relates to wages, hours and conditions of employment, then it is subject to collective bargaining. In between these two ends of the spectrum are varying

shades, which are not subject to any prospective rule making.

I would reverse the court below on items Nos. 3 and 22.

Judges CRUMLISH, JR., and BLATT join in this opinion.